**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

CHARLES W. PIKE,

               Plaintiff,

vs.                                       Case No. 5:12-cv-146-Oc-32PRL

TRINITY INDUSTRIES, INC., etc., et al.,

               Defendants.

_____

## ORDER

      Plaintiff Charles Pike was the passenger in a Ford F-150 truck when it went off the road and struck a guardrail in Lake County, Florida on October 29, 2010. The end terminal of the guardrail, which had been improperly repaired in 2009 by the Florida Department of Transportation ("FDOT") following an earlier accident, entered the truck cabin through the passenger side wheel well causing terrible injuries to Pike, a young man whose medical treatment included a below-the-knee leg amputation.

      In this lawsuit, Pike claims that the guardrail system manufacturer, Trinity Highway Products, LLC and its parent company, Trinity Industries, Inc. (together, "Trinity"), failed to warn FDOT that its guardrail system could fail if not repaired in compliance with the original installation instructions. Trinity has moved for summary judgment on several grounds. Upon review, the Court holds as a matter of law that FDOT is a "sophisticated user" of guardrail systems, familiar with the protocols for their installation, inspection and repair. Therefore, Trinity had no duty to warn FDOT of the danger of negligent repairs, and summary judgment is due to be entered in Trinity's favor.

## I. Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (citation omitted). The Court "must view all evidence and reasonable inferences in the light most favorable" to the non-moving party; however "the mere existence of a scintilla of evidence in support of [that party's] position will be insufficient." Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 702 F.3d 1312, 1316 (11th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

This case is brought under the Court's diversity jurisdiction[1] and the parties agree that Florida law governs.

---

[1]Pike is a citizen and resident of Florida. Trinity Industries, Inc. is a Delaware corporation with its principal place of business in Texas. Trinity Highway Products, LLC is a Delaware limited liability company with its principal place of business in Texas. Trinity Industries owns 100% of the interest in Trinity Highway Products, LLC. See Docs. 9, 54, 55 & 56 (certificate of interested parties, revised amended complaint, defendants' answers to revised amended complaint).

## II.   Background[2]

In 2007 Trinity was awarded a contract with the State of Florida for the installation of Trinity's ET-Plus end terminal system and guardrail at the intersection of State Road 33 and Groveland Airport Road in Lake County, Florida.  A state-approved contractor installed the guardrail.  Trinity guardrail systems are not "retail" products; rather, they are sold exclusively to municipalities, states, and other government entities or their contractors.  See Doc. 135, Ex. U (Deposition of Trinity Vice-President of International Sales and corporate representative Brian Smith) at Transcript ("Tr.") 17.  Trinity's ET-Plus end terminal system is comprised of over fifty component parts shipped as a self-contained package with everything needed to assemble the entire system except the tools.[3]  See Doc. 135, Ex. F (ET-Plus Installation Instructions) at p. 6; Doc. 135, Ex. H (Affidavit of Malcolm Ray, P.E., Ph.D.) at ¶ 13.

Developed and patented by Texas A&M University's Transportation Institute (an agency of the State of Texas), and manufactured and sold by Trinity through a licensing agreement, a key feature of the ET-Plus end terminal system is that, upon impact, the end piece (or extruder head) is pushed by the vehicle along the first section of guardrail until it

---

[2]While much of the technical detail comes from Trinity personnel or experts it hired, Pike has not presented evidence to dispute these points. In fact, the only evidentiary material Pike submitted in opposition to summary judgment were excerpts of five of the depositions of Trinity and FDOT personnel that Trinity filed in support of summary judgment, and excerpts of two other depositions of Trinity personnel. See Docs. 142 & 143.

[3]According to Trinity's Brian Smith, if multiple units are ordered, the guardrail and head pieces are shipped in groups, but the other parts and assembly hardware are individually packaged and shipped for every unit. See Doc. 135, Ex. U at Tr. 25.

hits a self-releasing cable, which then causes the guardrail to feed through the extruder head, flattening and deflecting away from the vehicle. Doc. 135, Ex. D (Deposition of Roger P.J. Bligh, Ph.D., Texas Transportation Institute research engineer) at Tr. 17-18.[4] The ET-Plus assembly includes a rail with specially designed slots into which the ET-Plus cable anchor bracket fits. Other (non-ET-Plus) cable anchor brackets do not fit into the specially designed slots and therefore cannot be installed on the ET-Plus rail. See Doc. 135, Ex. U at Tr. 32-33. As explained in Trinity's installation instructions for the ET-Plus guardrail end treatment:

> The cable anchor bracket (PC-704A[5]) is secured to the rail panel by inserting the protruding hooks on the bracket into the slots in the rail panel. It is locked into place by pulling the bracket toward the impact end of the unit.

Doc. 135, Ex. F (ET-Plus Installation Instructions) at p. 15. Trinity manufactures several variations of the ET-Plus system to accommodate various state standards. See Doc. 135, Ex. L (Deposition of Don J. Gripne, Trinity representative and trainer) at Tr. 14. The ET-Plus Installation Instructions reference variances in the materials list and installation procedures depending on a given state's specifications and preferred options. See Doc. 135, Ex. F (ET-Plus Installation Instructions) at pp. 1-6.

---

[4]All such energy-absorbing guardrail end treatments approved for use on U.S. highways use similar self-releasing cables to function properly. Doc. 135, Ex. H (Affidavit of Trinity expert, Malcolm Ray) at ¶ 14.

[5]Although the parts are identified by part number in the Installation Instructions, and a description of the parts listed by part number is included at page 4 of the instructions, the parts themselves are not stamped or tagged with a part number and the schematic drawings of the guardrail end treatment in the instructions do not identify the components by part number. Doc. 135, Ex. F (ET-Plus Installation Instructions) at pp. 1-3.

In addition to the Trinity Installation Instructions, FDOT has its own materials used to train employees about guardrail installation, inspection and maintenance. According to FDOT, "[g]uardrail systems comprise the rail that runs down the road and the end treatment that protects vehicles from end-on hits." Doc. 135, Ex. O (FDOT Computer Based Training ("CBT") Slides) at Guardrail Introduction slide 6. The training slides explain that the focus is mainly on end treatments, "because they are the most complicated part of the system and require the most rigorous inspection." Id. FDOT explains that the first step in guardrail installation is to "[r]eview [the guardrail's] [d]esign [s]tandards and manufacturer's specifications" and further instructs that the "[i]nstallation of end treatment varies according to treatment used." Id. at Guardrail Installation slides 1, 11. The audio that accompanies the training slides explains that "[a] guardrail will protect the public only if it [is] properly installed and inspected." Doc. 135, Ex. P (FDOT CBT Transcript) at Tr. 8. FDOT explains that "[o]nce the installation is completed, the maintenance of the terminals is now the responsibility of the State or Highway agency." Id. at Tr. 41. The FDOT materials include instructions on the installation of various types of end treatments, using the ET-2000 as an example of a parallel end treatment.[6] Id. at Tr. 8-9. The ET-2000 is described as a cable-anchored system whose impact head is designed to travel down the guardrail path, while the guardrail is forced through a feeder chute and flattened and curled away from the impact.

_____

[6]As described by Brian Smith, Trinity's corporate representative, the ET-2000 is an earlier generation of the ET-Plus, but the anchor assembly design is the same. Doc. 135, Ex. U at Tr. 12-13. In the FDOT materials, the ET-Plus is described as a related product to the ET-2000 that installs the same way; the user of the computer training program is directed to refer to the Florida Design Standards for the product if there are any questions about the installation. Doc. 135, Ex. P (FDOT CBT Transcript) at Tr. 8-9.

Id. at Tr. 9. Detailed instructions for the entire installation are then described. Id. at Tr. 9-13.

Guardrail repairs are supervised by an FDOT employee using either FDOT laborers or prison inmates for the work crew and are then inspected by an FDOT supervisor. Doc. 135, Ex. B. (Deposition of FDOT engineer Philip Maggio) at Tr. 21-25. Maintenance and repair are discussed in the ET-Plus installation instructions, which explains that inventory should be taken following an accident to determine which parts may be reusable and which may need to be replaced. Doc. 135, Ex. F at p. 19. The Trinity instructions state that the anchor cable and bracket should be checked for damage and that, once replacement parts have been obtained, the system can be repaired "following the installation instructions." Id. As noted above, the installation instructions explain that the ET-Plus cable anchor bracket is secured to the rail panel by inserting the protruding hooks on the bracket into the slots in the rail panel. Doc. 135, Ex. F (ET-Plus Installation Instructions) at p. 15 (emphasis added). The FDOT training materials also include detailed instructions for inspecting various guardrail systems, directing the inspector in each instance to "[a]sk yourself, as the inspection begins, is the guardrail installed according to the Design Standard used at the time of installation." Doc. 135, Ex. P (FDOT CBT Transcript) at Tr. 30-31.

Trinity also offers training to state departments of transportation and contractors whenever requested. Doc. 135, Ex. L (Gripne Deposition) at Tr. 34-35. Trinity representative Don Gripne conducted a training session with approximately 50 FDOT maintenance employees on November 6, 2008 in Lake City. See Doc. 135, Ex. M (course roster), Doc. 135, Ex. L. (Gripne Deposition) at Tr. 36-40. Trinity's training sessions typically include handouts of the relevant installation manuals and design drawings, and a slide

6

presentation about the various products used by that state, including photographs of the guardrail systems and their components. Id. at Tr. 8, 47-50. Gripne testified that the training sessions are tailored to the needs of each particular state and the design drawings used in the slides he showed at the FDOT training session were created by the state, depicting the guardrail systems used in Florida. Id. at Tr. 47.

Trinity has a trailer with examples of the various products that it sometimes brings to training sessions to provide hands-on demonstrations of how the systems work. Gripne brought the trailer to the 2008 Lake City training session; samples of the ET system and the SRT system were on the trailer.[7] Id. at Tr. 47, 81. Gripne's FDOT presentation included instruction about the ET-Plus and two other Trinity products used on Florida roadways and a demonstration of a new product. Id. at Tr. 37-38. At the conclusion of Gripne's four-hour training session in Lake City (which included review of over 100 slides), he administered a test at the request of FDOT so that the correct answers could be reviewed with everyone to ensure a complete understanding of the installation and maintenance of the Trinity guardrail

---

[7]Whereas the ET-2000 and ET-Plus are examples of energy absorbing "parallel" end treatments (where the rail is parallel to the road and the end treatment is designed to absorb the vehicle's momentum by bending the rail and breaking the posts, Doc. 135, Ex. P (FDOT CBT transcript) at Tr. 4), the SRT system, which is also manufactured by Trinity, is an example of a non-energy absorbing "flared" end treatment. In a flared end treatment (so called because the end treatment is curved away from the road), the end piece is not expected to move and the cable anchor assembly is bolted to the rail. See Doc. 135, Ex. R (Report of Trinity expert, Malcolm Ray) at 12; Ex. P (FDOT CBT Transcript) at Tr. 4. When a vehicle hits a properly installed flared end treatment, the vehicle should break the post and bend the rail, coming to a safe, gradual stop. Doc. 135, Ex. P (FDOT CBT transcript) at Tr. 4. The SRT-350 version of the SRT system is a common end treatment on Florida roadways. Doc. 135, Ex. B (Maggio Deposition) at Tr. 44-45; Ex. U (Smith Deposition) at Tr. 57.

systems that had been discussed during the session.  Id. at Tr. 36-37, 39.  One of the questions on the test addressed the manner of installing a cable anchor bracket to the ET-Plus.  Doc. 135, Ex. N (FDOT test administered by Gripne).[8]

In 2009, an accident at the State Road 33 and Groveland Airport Road intersection caused impact to the ET-Plus guardrail.  Following this 2009 accident, and contrary to all of these Trinity and FDOT training materials and instruction manuals, FDOT employee Richard Houle, who had attended the 2008 training session, repaired the guardrail with an FDOT field crew and prison inmates by using a "random collection" of parts from the FDOT warehouse.  Doc. 135, Ex. H (Ray Affidavit) at ¶ 15.  The new assembly included an obsolete piece of guardrail built in 1965 that had not been approved for use on U.S. highways since 1994 and an assortment of parts that are not components of the ET-Plus system.  Id. at ¶ 16.  In fact, out of the fifty or so separate parts used to assemble an ET-Plus guardrail end terminal, only one part used in the 2009 FDOT repair was from the ET-Plus system-- the extruder head.

_____

[8]Gripne, who is assigned to Trinity's marketing department, said the training sessions generally also include demonstrations of Trinity's newest product lines so a given state can consider incorporating them into their state standards.  Doc. 135, Ex. L at Tr. 47.  FDOT employee Richard Houle stated that the demonstration of new product lines was a prominent feature of Gripne's November 2008 training session.  Nonetheless, both Houle and FDOT supervisor James Hudson recalled that the trailer had guardrail assemblies on it and Houle testified that the session included time for questions.  Doc. 135, Ex. K at Tr. 16; Ex. C at Tr. 22.  Additionally, Gripne's slide presentation and the test he administered belie Pike's suggestion that this was merely a marketing session at which training did not take place.  Doc. 135, Ex. N.  The actual slide presentation is Exhibit 7 to Brian Smith's deposition, Doc. 135, Ex. U, but was not filed in the record as far as the Court can tell.  However, Gripne thoroughly discussed it during his deposition, explaining how, for example, certain photographs were used to demonstrate differences between posts and rails used with the ET series and the SRT system.  Doc. 135, Ex. L at Tr. 75-80.

Id.[9]  Critically, instead of using an ET-Plus breakaway cable anchor bracket with the special ET-Plus slotted rail that goes with it, FDOT fastened the ET-Plus extruder head to a parallel end treatment rail using a cable anchor system that bolts onto such a rail.  Doc. 135, Ex. R (Ray Report) at p. 9.  Connecting the ET-Plus extruder head in this fashion rendered the end terminal completely nonfunctional in that it could no longer slide along the guardrail, feeding, flattening, and deflecting the guardrail away from the vehicle as the ET-Plus system was designed.  Id. at ¶¶ 17-18.  Instead, the end terminal essentially became part of an immoveable battering ram awaiting impact.

FDOT's faulty repairs remained unnoticed and were still in place at the time the truck Pike was riding in struck the end terminal in October 2010. Because the end terminal used a cable anchor system that was bolted to the guardrail instead of being fastened by self-releasing hooks, the guardrail could not feed through the extruder head and flatten and slide away from the impact; instead, the end terminal and guardrail entered the passenger side of the truck, nearly severing Pike's leg on impact.

## III.    Legal Proceedings

In April 2011, Pike sued both FDOT and Trinity Highway Products, LLC in state court bringing claims of negligence as to FDOT for the faulty repair on the guardrail and negligent

---

[9]In his report, authored subsequent to his affidavit, Ray opined that a piece of cable was also from the ET-Plus.  See Doc. 135, Ex. R at 9.  However, Trinity representative Don Gripne said of the piece of cable, "I can't tell you whether it is [a Trinity product] or it is not . . . [b]ecause anybody can manufacture . . . that piece of cable."  Doc. 135, Ex. L at Tr. 71-72.  Even if originally from the ET-Plus, the presence of the cable would not change the analysis because the cable was affixed to a cable anchor assembly that was bolted to the rail, a method undisputedly inconsistent with the installation or repair of an ET-Plus system.

and strict liability failure to warn as to Trinity. Doc. 135, Ex. A (State Court Complaint). On March 13, 2012, after discovery was complete, the parties appeared for a hearing before the state court judge in which Pike's counsel explained he had discovered that it was not the faulty repair that caused the accident, rather, it was a change in the ET-Plus design that prevented the end terminal from working properly.[10] Doc. 135, Ex. I (transcript of state court hearing) at Tr. 7, 28-29. On March 19, 2012, Pike voluntarily dismissed the state court suit (thus, dropping all claims against FDOT) and filed this federal diversity case against Trinity alleging theories of negligence, gross negligence, and strict liability, related largely to the alleged design defect. Approximately six months later, when Trinity's counsel stated his understanding that Pike had withdrawn the failure to warn claims in this federal suit, Pike amended the complaint to clarify that, in addition to the design defect claims, he was alternatively pursuing the failure to warn claims. Trinity then filed a motion for summary judgment as to all claims.[11] Pike only responded as to the failure to warn counts and his counsel confirmed at oral argument that, despite his initial enthusiasm for the design defect theory, he has now abandoned the design defect claims.[12] Thus, as Pike has now postured his case, he is no longer seeking to hold FDOT responsible for negligent installation, repair

---

[10]Pike's design defect claim alleged that a 2005 change in the design of the ET-Plus caused the guardrail to get stuck inside the chute attached to the end terminal thereby preventing the guardrail from flattening and sliding away from the impact. See Doc. 54 at ¶¶ 31-43.

[11]By agreement of the parties, the discovery gathered for the state court case was available for the parties' use in this federal case.

[12]The Court incorporates by reference the entire transcript of the May 9, 2014 oral argument (Doc. 149).

and maintenance of the guardrail, nor is he claiming a defect in Trinity's design of the guardrail system.  He is proceeding solely on a failure to warn theory against Trinity.

## IV.   Discussion

In Counts VII through X of his amended complaint (Doc. 54), Pike brings claims of negligence and strict liability against Trinity based on failure to warn, alleging that Trinity failed to warn FDOT personnel that parts from other guardrail systems could not be combined with Trinity's ET-Plus guardrail system without compromising the system's integrity.[13]

While Florida law recognizes claims of negligent and strict liability failure to warn,[14] it also recognizes the "sophisticated user" or "learned intermediary" doctrines which relieve a manufacturer of the duty to warn where there is a sophisticated user or learned intermediary with knowledge of the hazard.  See Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 105 (Fla. 1989) (approving appellate court opinion affirming summary judgment for drug manufacturer in suit by patient where prescribing physician was a learned intermediary; holding as a matter of law that inadequate warning could not have been proximate cause of

---

[13]Count VII is negligent failure to warn against Trinity Highway Products; Count VIII is strict liability failure to warn against Trinity Highway Products; Count IX is negligent failure to warn against Trinity Industries and Count X is strict liability failure to warn against Trinity Industries.

[14]See, e.g., Faddish v. Buffalo Pumps, 881 F.Supp.2d 1361, 1370 (S.D. Fla. 2012) (explaining difference under Florida law between negligent failure to warn, which focuses on the defendant's conduct, and strict liability failure to warn, which focuses on the product and consumer expectations); Giddens v. Denman Rubber Mfg. Co., 440 So.2d 1320, 1322 (Fla. 5th DCA 1983) (quoting comment (h) to section 402(A) of the Restatement of Torts (Second) for the proposition that a product which is otherwise safe for normal handling may be required to include a warning if danger may result from a particular use of the product).

injury because doctor was aware of danger, thus manufacturer could not be penalized for doctor's failure to convey the danger to the patient); Edward M. Chadbourne, Inc. v. Vaughn, 491 So.2d 551, 552-54 (Fla. 1986) (holding that road contractor had no liability for injuries suffered by auto accident victim as a matter of law where FDOT had responsibility for testing, examining, maintaining and repairing the roadway and was a highly knowledgeable and sophisticated purchaser); Talquin Electric Co-op., Inc. v. Amchem Products, Inc., 427 So.2d 1032, 1033 (Fla. 1st DCA 1983) (holding herbicide supplier bore no liability as a matter of law for company's misuse of product where company was aware that the herbicide would kill farmer's crops if it was used near irrigation water; explaining that a "knowing misuse of a product does not render the manufacturer liable"); Zunck v. Gulf Oil Corp., 224 So.2d 386, 386-88 (Fla. 1st DCA 1969) (affirming summary judgment in favor of bulk supplier of odorless natural gas where supplier informed its retail distributor that supplier had not added odorant and where retail distributor told supplier that it would add odorant, yet failed to do so, leading to fatal explosion in retail customer's home); Prather v. Upjohn Co., 797 F.2d 923, 924-27 (11th Cir. 1986) (affirming entry of directed verdict in favor of manufacturer on strict liability failure to warn claim under Florida law where manufacturer's foam product was sold exclusively to "knowledgeable industrial" customers who were advised that heating the foam could release toxic fumes, even though customer's employee was directed to heat the foam and was never warned of danger); Rounds v. Genzyme Corp., 2011 WL 692218 (M.D. Fla. Feb. 18, 2011) (granting drug manufacturer's motion to dismiss under Florida law where doctor had knowledge of danger but failed to convey it to patient). See also, Restatement (Second) of Torts, § 388, Comment k (advising that a warning of

12

defect is unnecessary where a supplier has "reason to believe that those who use it will have such special experience as will enable them to perceive the danger . . .") (as cited by <u>Alvarez v. E&A Produce Corp.</u>, 708 So.2d 997, 1000 (Fla. 3d DCA 1998). Whether a duty is owed to a party under Florida law is a question of law for the court rather than a jury. <u>Virgilio v. Ryland Group, Inc.</u>, 680 F.3d 1329, 1339 (11th Cir. 2012) (citing <u>McCain v. Florida Power Corp.</u>, 593 So.2d 500, 502 (Fla. 1992); <u>Insua v. JD/BBJ, LLC</u>, 913 So.2d 1262, 1263 (Fla. 4th DCA 2005) (affirming summary judgment for manufacturer who had no duty to warn electrician of danger of electrocution, explaining that "[w]hether a duty exists is a question of law for the court").[15]

---

[15]Plaintiff cites <u>Parker v. Schmiede Machine and Tool Corp.</u>, 445 Fed. Appx. 231, 235-36 (11th Cir. Oct. 21, 2011) for the proposition that the determination of whether a customer is a sophisticated user or learned intermediary is a question of fact for a jury. <u>See</u> Doc. 142 (plaintiff's brief) at p. 9. However, <u>Parker</u> does not so hold. In <u>Parker</u>, the Eleventh Circuit discussed the evidence supporting a finding that the industrial consumer was a sophisticated user of the defendant's chemical, discussed the plaintiff's failure to put forward sufficient evidence to the contrary, and affirmed the district court's entry of summary judgment in favor the manufacturer on the grounds that its industrial customer was a sophisticated user to whom the manufacturer owed no duty. <u>Id.</u> at 234-38. Thus, in a case where there is insufficient evidence to rebut the defendant's showing that a user is sophisticated within the meaning of the doctrine, the Court may hold that no duty is owed as a matter of law.

As described by the Michigan Court of Appeals,[16] the rationale behind the sophisticated user doctrine is that "[a] seller or manufacturer should be able to presume mastery of basic operations by experts or skilled professionals in an industry, and should not owe a duty to warn or instruct such persons on how to perform basic operations in their industry." Ross v. Jaybird Automation, Inc., 432 N.W.2d 374, 376 (Mich. App. 1988). As similarly explained by the Michigan Supreme Court:

> There are countless skilled operations such as the rigging of scaffolding, which involve otherwise non-dangerous products in potentially dangerous situations. A manufacturer of such a product should be able to presume mastery of the basic operation. The more so when, as here, the manufacturer affirmatively and successfully limits the market of its product to professionals. In such a case, the manufacturer should not be burdened with the often difficult task of providing instructions on how to properly perform the basic operation.

Antcliff v. State Employees Credit Union, 327 N.W.2d 814, 821 (Mich. 1982). See also, Parker v. Schmiede Machine and Tool Corp., 445 Fed. Appx. 231, 234 (11th Cir. Oct. 21, 2011) (explaining that under Georgia law, the sophisticated user or learned intermediary doctrine relieves a manufacturer of liability for failure to warn where members of the profession to whom the product is sold are generally aware of hazards known to the trade);

---

[16]Though the parties agree that Florida recognizes the learned intermediary and sophisticated user doctrines, there are few Florida cases discussing it outside of the context of pharmaceutical or chemical products and the Court has mentioned those deemed useful to the discussion. Some of these cases appear to apply the doctrine implicitly. See, e.g., Shell Oil Co. v. Harrison, 425 So.2d 67, (Fla 1st DCA 1983) (reversing and remanding for entry of judgment in favor of Shell which discharged its duty to warn retail consumers of danger of its chemical where intermediary (who formulated, packaged and labeled product for retail sale) was aware of danger). Both parties rely on non-Florida cases as persuasive authority regarding the contours of the doctrine and the Court likewise finds their explanations to be helpful and consistent with Florida law.

Carmical v. Bell Helicopter Textron, Inc., 117 F.3d 490, 495 (11th Cir. 1997) (holding that helicopter manufacturer had no duty under Georgia law to warn pilot that loss of lubrication to gearshaft could result in engine failure where pilot knew that maintenance of an oil lubricated engine required lubrication to engine); Powell Duffryn Terminals, Inc. v. Calgon Carbon Corp., 4 F.Supp.2d 1198, 1203 (S.D. Ga. 1998) (holding that chemical storage terminal was a sophisticated user under Georgia law to whom Calgon had no duty to warn that its cleaning product would ignite when used near stored chemicals); Fernandez v. Tamko Bldg. Products, Inc., ___ F.Supp.2d ___, 2014 WL 905115, *6 (M.D. La. March 7, 2014) ("Louisiana does not hold that a manufacturer is compelled to warn sophisticated purchasers of dangers of which the buyer either knows or should be aware.") (citation omitted); Duane v. Oklahoma Gas & Elec. Co., 833 P.2d 284, 287 (Okl. 1992) (holding that oil suppliers had no duty to warn of danger to commercial customer whose negligence or oversight resulted in explosion that injured its employee).

Trinity argues (and pled as an affirmative defense) that FDOT is a sophisticated user to whom it had no duty to warn under Florida law. Among others, Trinity cites Edward M. Chadbourne, in which the Florida Supreme Court held that Chadbourne, an FDOT road contractor, had no liability for injuries suffered by Vaughn in an auto accident. Vaughn was injured and his wife was killed when their car hit a drop off on a county road laid by Chadbourne. 491 So.2d 551. In quashing the district court's reversal of the trial court's granting of summary judgment, the Florida Supreme Court held Chadbourne bore no liability because the public road it created was not a product for purposes of strict liability, and FDOT, to whose specifications the road was created and inspected, "ha[d] at least as much

15

knowledge about road construction as does Chadbourne." Id. at 553. Additionally, the road was manufactured in accordance with state procedures, was tested and inspected by "a highly knowledgeable and sophisticated purchaser [FDOT]," and the responsibility for the maintenance and repair of the road rested with the County, not Chadbourne. Id. at 554. Pike does not contest the existence of the sophisticated user doctrine under Florida law, but argues Chadbourne is not on point because the Court's primary holding was that a county road was not a product, where here Trinity designed and manufactured a sophisticated, highly engineered guardrail system. As opposed to the construction of a road, with which FDOT is well familiar, Pike contends that Trinity has far superior knowledge with regard to the construction of its guardrail system.

However, the issue here is not the engineering and construction of the guardrail system (although FDOT is familiar enough with those that it has its own design drawings and state standards that Trinity is required to follow), but its repair and maintenance, matters that FDOT handles exclusively. As discussed above, FDOT has created an entire set of training materials devoted to guardrails, discussing the various types and how to install, maintain, repair and inspect them. See Doc. 135, Ex. O, P. The FDOT materials explain that "FDOT is responsible for maintaining guardrail systems so they function correctly" (Doc. 135, Ex. O (FDOT CBT Slides) at Guardrail Introduction slide 5); it explains that end treatments "are the most complicated part of the system and require the most rigorous inspection" (Id. at Guardrail Introduction slide 6) and directs employees to consult the manufacturer's instructions (Id. at Guardrail Introduction slide 2). The FDOT materials include step-by-step instructions with photos for installing various systems, including the ET-2000 (the self-

16

releasing cable system manufactured by Trinity that is the earlier generation of the ET-Plus). Doc. 135, Ex. O.

FDOT accepts its responsibility for the repair of the guardrail system at issue and admits that it failed in its responsibility. FDOT Operations Engineer Philip Maggio testified that the inspector who signed off on the 2009 repair (James Hudson) should have noticed that the end terminal was not right. Doc. 135, Ex. B (Maggio Deposition) at Tr. 111. Hudson's supervisor, FDOT field manager James Tyson, also testified that he did not know why Hudson didn't notice that the wrong cable anchor bracket was used. Doc. 135, Ex. J (Tyson Deposition) at Tr. 13,16. Hudson himself, who had worked for FDOT for approximately ten years at the time of the 2009 repair, testified that the repair protocol includes walking the length of the guardrail to ensure that it is all assembled correctly. Doc. 135, Ex. C (Hudson Deposition) at Tr. 36. Hudson had attended the 2008 Trinity training session that Gripne conducted[17] and had also traveled to Orlando on a prior occasion to attend a Trinity training session that included a demonstration of the various Trinity end terminals and rails. Id. at Tr. 16-19. Hudson recalled that at the Orlando training session Trinity staff answered questions posed by FDOT staff regarding the proper use of certain end treatments and rails. Id. at Tr. 19. While Hudson did not recall receiving instruction about ensuring that the correct parts were used, he did recall that the Trinity representative at the

_____

[17]Hudson did not recall that Gripne provided any instruction on guardrail installation but his memory of what took place was not clear and his recollection was that the training session lasted only "about half an hour[;] [m]aybe an hour," versus the four hours that Gripne's paperwork indicates. See Docs. 135, Ex. C (Hudson Deposition) at Tr. 21; Ex. M (course roster, listing Hudson's name on page 3), showing 4 hour course titled "Guardrail Training (proper installation and maintenance)."

Orlando session explained how the ET-Plus and the SRT-350 systems were designed and how the systems each functioned during crashes.[18] Id. at Tr. 20. Hudson said when making repairs, FDOT consults the design drawings and manufacturer's booklets for the particular guardrail to ensure the repair is done properly. Id. at Tr. 11, 34. Hudson was familiar with the design drawings for the ET-Plus system and had consulted them in the past when making repairs. Id. at Tr. 34. Hudson explained that in addition to on the job training, staff are trained on the FDOT CBT course (described above) before going into the field to repair guardrails. Id. at Tr. 25-26. Hudson said that when conducting inspections, he used to bring a parts list along to make sure repairs were done properly but as he has become more experienced, he just uses a mental list. Id. at Tr. 28-29.

Hudson said, "I guess it was an oversight" that the end terminal was misassembled during the 2009 repair-- and it was "hard for [him] to believe" that the wrong bracket was there and that he "didn't catch it." Id. at Tr. 32. Hudson said somebody must have picked up the wrong part (Id. at Tr. 34-35), revealing that he as an inspector knew there was a right way and a wrong way to assemble the end terminal and that bolting a cable anchor bracket to the rail on an energy-absorbing self-release system like an ET-Plus was the wrong way.[19]

---

[18]During FDOT's 2009 repair, it was an anchor cable such as is used by the SRT-350 that was bolted to the rail, preventing the ET-Plus extruder head from continuing to slide down the rail during the Pike crash. Doc. 135, Ex. H (Ray Affidavit) at ¶ 18. Thus, FDOT personnel had indiscriminately and improperly used parts of two entirely different systems.

[19]Hudson recalled the 2009 repair but thought the paperwork was signed by Houle and not himself, creating some question as to whether Hudson signed off as the inspector. Doc. 135, Ex. C, Tr. 29, 39-41, 45-47. Hudson agreed he did inspect and sign off on the repairs following the Pike accident, which were also misassembled. Id. at Tr. 31-32.

Notwithstanding the FDOT training protocols, Richard Houle, the FDOT employee who handled the 2009 repair, testified that "in the real world" employees just go to the back of the FDOT warehouse and look for parts that look like the parts that are broken and piece it all back together. Doc. 135, Ex. K at Tr. 45-46. Houle, a six-year employee of FDOT, testified that his formal training consisted of shadowing other employees who taught him how to repair guardrails by essentially putting them back the way they were before. Id. at Tr. 22. If a part cannot be located in the FDOT warehouse yard, someone from the warehouse would order the part. Id. at Tr. 36. Houle testified that a copy of the ET-Plus parts list was kept on a shelf in the carpenter's room, which was essentially the "junk room." Id. at Tr. 40-41. According to Houle, "[w]e've got books laying all over the place around here . . . . [w]e could pretty much pick them up and review them at any time we choose to." Id. at Tr. 42. However, although the books with design drawings are available, Houle claimed no one consults them. Id. at Tr. 38-40. Houle agreed that with respect to the guardrail involved in the Pike accident, the other end of the same guardrail was assembled differently (correctly) but he says he repaired the damaged end to be the same way he found it (suggesting, perhaps, that FDOT had improperly repaired this same guardrail even earlier than the 2009 accident). Id. at Tr. 50-51.[20]

_____

[20]Hudson also said this is a dangerous intersection and that he has inspected this guardrail on other occasions in the past. There are apparently no records other than for the 2009 repair. Doc. 135, Ex. C (Hudson Deposition) at Tr. 45-46. While not a material dispute, contrary to Houle's testimony on this point, Trinity's expert Malcolm Ray reviewed photos taken from the 2009 accident (the one predating Pike's) and reports that the ET-Plus functioned as designed in that accident, with 18 feet of guardrail having been fed through and deflected by the ET-Plus extruder head (as opposed to the 18 inches fed through in the Pike crash). Doc. 135, Ex. R (Ray Report) at 21, 13.

Without a doubt, Houle did not follow Trinity's instructions or FDOT protocol when making the 2009 repairs and his failure to do so resulted in serious injuries to Pike.[21] When the 2009 repair was complete, what was left was not an ET-Plus guardrail system, but an ET-Plus extruder head added to a handmade, non-tested, non-engineered hodge-podge of guardrail pieces that unfortunately, but predictably, failed upon impact. Whether Trinity has a duty to warn a customer cannot depend on whether that customer fully trains and supervises its entire staff. FDOT had a protocol for training its staff and for repairing and inspecting the guardrails FDOT – not Trinity – is charged with maintaining. It is undisputed that if FDOT staff had followed its protocols, this guardrail would not have failed. Indeed, at oral argument, counsel for Pike conceded that Trinity's duty extended to FDOT and it is FDOT that has the duty and obligation to train its own employees. See Doc. 149 at Tr. 44-45.

Here, Houle's superiors are experienced in guardrail maintenance, repair and inspection and understood the importance of proper assembly even if Houle did not. FDOT engineer Maggio testified as to his knowledge of the two types of guardrail systems and those systems are carefully described in the FDOT computer based training materials. See Doc. 135, Ex. B (Maggio Deposition) at Tr. 33, Ex. O (FDOT CBT slides), Ex. P (FDOT CBT transcript). FDOT presumably purchased the ET-Plus guardrail system because of its energy-absorbing feature and FDOT was in a position to understand that the system cannot

---

[21]Though it is not an issue before the Court, had the case gone to trial, Trinity would have sought to assign fault elsewhere too and planned to list the driver of the pick-up along with FDOT on the verdict form as Fabre defendants. See Doc. 55 at ¶ 132 & Doc. 56 at ¶ 132 (Trinity's Affirmative Defenses).

function properly if the self releasing cable anchor bracket– a key component of the system– is bolted to the rail. Indeed, FDOT's own operations engineer and supervisor both agreed it was a mistake to secure the ET-Plus extruder head using a bolted on cable anchor system in the 2009 repair. Doc. 135, Ex. B (Maggio Deposition) at Tr. 35-36, 47-48, Ex. C (Hudson Deposition) at Tr. 31.[22] They also agreed that the FDOT inspector should have caught this mistake. Doc. 135, Ex. B (Maggio Deposition) at Tr. 111, Ex. J (Tyson Deposition) at Tr. 13, 16.

FDOT was aware that end terminals are complex and need to be repaired in accordance with manufacturer's instructions. The FDOT supervisor and engineer testified that the design drawings should be consulted and that inspections and maintenance would ensure that repairs are done correctly. Even if the FDOT staff involved in the actual 2009 repair failed to fully appreciate the complexity of the complete design of the ET-Plus guardrail system, they at least had an understanding that there were two types of systems– one with a parallel end treatment, and one with a flared end treatment. The guardrail FDOT

---

[22]As Texas Transportation Institute's engineer, Roger Bligh explained, "I am not sure how you would . . . confuse the parts if . . . you're at all knowledgeable . . . in the field . . . of these systems." Doc. 135, Ex. D (Bligh Deposition) at Tr. 89. In response to the question as to whether he had had any conversations about the possibility that parts could be improperly and mistakenly co-mingled, Bligh responded: "[Y]ou're making, I think, inappropriate assumptions about our industry perhaps." He elaborated: "[T]hese systems are . . . designed and engineered for a specific reason and a specific purpose to meet a certain standard and . . . the end user is . . . a transportation department, . . . and they're . . . going to have knowledgeable installers and contractors that . . . are putting these systems in." Id. at Tr. 89-90. He further explained that just as the installers would consult the manuals, so too would those performing the repairs to ensure the system continues to conform to "the requirements and . . . specifications of the user agency . . . whose engineers are . . . prescribing . . . a certain product at a . . . given location." Id. at 90-91.

assembled after the 2009 accident at the corner of Groveland Airport Road and State Road 33 was neither.

On this record, the Court finds Pike has failed to come forward with more than a scintilla of evidence to rebut Trinity's showing that FDOT was a sophisticated user of the ET-Plus guardrail system.[23]   See <u>Parker</u>, 445 Fed. Appx. at 235 (holding no duty owed by

---

[23]Pike points to testimony from William Burney, Trinity's Vice-President of Domestic Sales and Marketing, to suggest that Trinity was aware that "co-mingling" of parts was a known problem that Trinity had a duty to address. Doc. 143, Ex. F (Burney Deposition) at Tr. 47-48. But Burney later explains that the "co-mingling" issue of which he spoke had to do with co-mingling of other energy-absorbing system parts that look alike, not the co-mingling of parts from entirely different systems. <u>Id.</u> at 56-57. The cable anchor treatment FDOT mistakenly bolted to the rail connecting to the ET-Plus extruder head is part of a flared end treatment (such as the SRT), not part of an energy-absorbing system such as the ET-Plus. <u>Id.</u> <u>See also</u>, Doc. 135, Ex. B (FDOT engineer Maggio Deposition) at Tr. 44-45, 52 (explaining the difference between the SRT system, a "bolted on model," and the ET-Plus, "a hanging model").

Pike also devotes much of his brief to a discussion of the need for decals or warning labels to advise FDOT staff as to which parts go with which system, contending repeatedly that Trinity's trainer, Don Gripne, agreed with its position. As plaintiff's counsel conceded at oral argument, that reading takes Gripne's testimony out of context. The record is undisputed that FDOT and its staff recognized the difference between the two basic types of guardrail systems and FDOT was a sophisticated user for all the reasons stated above. Trinity therefore had no duty to warn that parts from one type of system should not be used to repair the other type. FDOT already knew that. Thus, this is not a case where a jury must decide whether warnings provided them were sufficient and reasonable under the law. <u>Cf.</u>, <u>Union Carbide Corp. v. Aubin</u>, 97 So.3d 886, 898-901 (Fla. 3d DCA 2012) (explaining in an asbestos case that the sufficiency and reasonableness of warnings are fact questions unless the warnings are 'accurate, clear, and unambiguous,' and further noting the learned intermediary doctrine could be a defense where the evidence was not in conflict with regard to the knowledge and sophistication of the intermediary and the information conveyed by the manufacturer). A case such as <u>Aubin</u>, that has an intermediary and an end user of a product who needs to be warned of a danger, is far removed from the situation here. Trinity could not possibly have warned Pike about the danger of the guardrail improperly repaired by FDOT. And, as a matter of law, Trinity had no further duty to warn FDOT when FDOT was a sophisticated user that already knew that improper installation of the guardrail was potentially lethal.

chemical supplier to warn manufacturer's employees where supplier's customer (the manufacturer) was sophisticated user of the chemical which had used the chemical for years, had produced its own training materials, and used its own staff to advise employees on procedures for handling chemical).[24]

## V.    Conclusion

For his own reasons, Pike gave up a seemingly well-taken negligence claim against FDOT in favor of a design defect claim against Trinity that he later abandoned.  He elected to proceed solely on a failure to warn theory.  However, as a matter of law, Trinity had no duty to warn FDOT what it already well knew:  that it should avoid using parts from other guardrail systems when repairing the ET-Plus guardrail end terminals.  Trinity's Motion for summary judgment (Doc. 135) is **granted** and judgment is due to be entered in favor of Trinity Industries, Inc. and Trinity Highway Products, LLC as to Pike's failure to warn claims, Counts VII, VIII, IX, X of his amended complaint (Doc. 54).  As Pike has abandoned his design defect claims, Counts I, II, III, IV, V and VI of his amended complaint (Doc. 54) are dismissed with prejudice.  The Clerk shall enter judgment accordingly and close the file.

---

[24]Because the Court finds FDOT is a sophisticated user of guardrail systems to whom Trinity had no duty to warn about the danger of using other guardrail parts while repairing an ET-Plus system, the Court does not reach Trinity's alternative arguments as to why summary judgment should be entered in its favor on these counts, nor does the Court address the other pretrial motions by Trinity (mainly seeking to exclude other evidence put forward by Pike).  Docs. 132, 133, 134, 136 are therefore **moot**.

**DONE AND ORDERED** at Jacksonville, Florida this 16th day of July, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record